UNITED STATES DISTRICT COUT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SONJA LANG, | § | |
| **Plaintiff** | § | |
| | § | |
| VS. | § | A CIVIL ACTION 6:20-cv-00653 |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
| **Defendant** | § | **A JURY IS DEMANDED** |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW SONJA LANG, Plaintiff herein, complaining of TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendant herein (hereinafter referred to as "Defendant," "TDCJ," or "Defendant TDCJ"), and in support would show the Court as follows:

## I.   NATURE OF THE CASE

1.      This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.,* for unlawful employment practices – namely, retaliation against Lang for having previously complained of discrimination under Title VII, and for complaining of such retaliation.

2.      Plaintiff **SONJA LANG** ("Plaintiff," or "Lang"), who was employed by TDCJ, alleges TDCJ discriminated against her on the basis of race (for which Lang brings no cause of action in this case), then retaliated against her for engaging in the protected activity of making oral and written complaints of discrimination and retaliation. Defendant TDCJ's pattern of retaliation included subjecting Lang to a hostile work environment (including unfavorable and material alterations to the terms and conditions of employment, mocking her religion and medical condition, and unwarranted disciplinary actions), then termination.

## II.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, because this action is based on Title VII, 42 U.S.C. §2000e, *et seq.*, a federal statute, and other federal statutes presenting a federal question. This Court also has jurisdiction pursuant to 28 U.S.C. §1337, because the action is based on a federal statute regulating commerce.

4.      Venue is proper in the Western District of Texas, Waco Division, pursuant to 28 U.S.C. §§1391(b)(2), because a substantial part of the events or omissions (Defendant's unlawful employment practices) giving rise to Plaintiff's claims occurred in Marlin, Falls County, Texas, located within the territory of the Waco Division of the Western District.

## III.   PARTIES

5.      Plaintiff **SONJA LANG** is an individual residing in Falls County, Texas.

6.      Defendant **TEXAS DEPARTMENT OF CRIMINAL JUSTICE** is a state agency of the State of Texas, which has been served and has already appeared. No further service is necessary at this time.

## IV.   FACTS

### A) Lang's Outstanding Career With TDCJ:

7.      Until TDCJ began unlawfully subjecting her to a hostile work environment as retaliation for filing a complaint of discrimination, Lang enjoyed a long and distinguished career with TDCJ, rising to the rank of Lieutenant. Lang began her career with Defendant Texas Department of Criminal Justice on June 1, 1994. She was proud to be a correctional officer for the State of Texas. Lang always followed and enforced TDCJ's policies and procedures. She took pride in her job and, every year she had the privilege of doing so, she strived to do it professionally. Over her twenty-four (24) year career at TDCJ, Lang served in several different departments. She was a

kitchen officer for six (6) months, filled in as the beauty shop officer, and she was a transportation officer for two (2) years.

8.       In February of 2012, Lang and TDCJ decided it was time for Lang to share her knowledge and experience by leading others, and Lang was promoted to Sergeant of Correctional Officers. After being Sergeant for only a year, Lang was promoted again to Lieutenant of Correctional Officers. Lang excelled at this position and often received praise from administration, co-workers and offenders ("offenders" is the technical jargon TDCJ uses to refer to prisoners). Offenders often stated they knew when Lang was running the unit they had to abide by TDCJ's policies, but they also knew they were safe and certain to receive all that the State provided for them. Lang also worked hard after hours to better herself – pursuing an education that would make her an even greater asset to TDCJ. In May of 2014, Lang received an Associate in Arts from Houston Community College, which included numerous credits relating to criminal justice. By the spring of 2017, Lang had also earned seventy-two (72) credit hours toward a Bachelor's Degree.

9.       On February 3, 2017, Lang received a Certificate of Achievement for the Regional Training and Development Program. This program is designed for promotable prospects (such as Lang) to have an opportunity to work in the Regional Office, where they learn different aspects of the job, as well as get to know different administrators at the other units in the region. Each supervisor usually completes three (3) months at the regional rotation, but due to Lang's hard work and dedication, her time at the Regional Office was extended an extra month.

10.       By all indications, in early 2017 Lang's career at TDCJ appeared to be going in the right direction. She had a long history of promotions and raises, she had never received any disciplinary action, and it was obvious that TDCJ placed great faith and trust in her. As Lieutenant, Lang was responsible for the operations of the entire unit during her shift. Lang ensured the building schedule

was adhered to, and that everyone did their job in a safe and professional manner. She was dedicated to TDCJ and her administrators. At any given time, the safety and wellbeing of 1,200 offenders and roughly fifty (50) TDCJ staff was in her hands. Most of her shift, she was entrusted by TDCJ to be the highest ranking official on the unit.

11.     Lang received an annual evaluation from Major Patrice Williams, evaluating Lang's performance for the period of October 25, 2016, to October 25, 2017. Williams' evaluation of Lang established that Lang had "exceeded expectations" (the highest score possible) on all six (6) essential functions of her position. The evaluation acknowledged Lang had adhered to expected standards of conduct, including the rules of conduct described in TDCJ's Listing of Employee General Rules of Conduct and Disciplinary Violations, and that Lang had adhered to TDCJ Safety Policy. On the three areas of supervisor functions on which Lang was evaluated (scheduling employees' work and off-duty time, providing training and instruction to subordinates, and evaluating and counseling subordinates), Lang received "exceeds expectations" (the highest score possible) on all three.

12.     In short, after such dedicated service, consistently favorable reviews and evaluations, promotions and raises, and a solid disciplinary record, Lang had no reason to believe her job was in jeopardy. In fact, Lang will show her job with TDCJ was *not* in jeopardy *until* she complained of discrimination in the decision not to promote her to Captain, and then reported the retaliation she experienced for having made such complaint.

   **B) Lang Complains TDCJ's Failure to Promote Her to Captain was Racial Discrimination, Which Results in Continuous Hostile Work Environment Characterized by Repeated Retaliation and, Ultimately, Termination:**

13.     On June 6, 2017, Lang turned in her application for Captain of Correctional Officers. At that point in Lang's career, Lang and Major Cordelia Miller had become friendly. A few days prior

to Lang's interview for the Captain position, Miller and Lang discussed the fact that Lang (a black, African-American woman) and two other Lieutenants – Martha Young (a black, African-American woman) and Kristi Colbert (a Caucasian woman) – were likely the most qualified for the Captain's position. Miller signaled that Warden Wright (also a Caucasian woman) could possibly promote Colbert – the Caucasian woman – even though Colbert was the least qualified of the three. Miller summed up the conversation by saying Warden Wright "would probably do the right thing" – i.e., not promote the least qualified, white, candidate.

14.     After Colbert received the promotion to Captain, Lang complained to Major Miller on June 27, 2017, that Lang had been discriminated against because she was black / African American. Prior to this time, Major Miller had previously stated to Lang that Warden Wright and other administrators who reported to Wright referred to the black / African American women from the Marlin unit – including Lang – as "negans." Miller indicated Wright and the others talked about how they could not tell the "negans" anything, because the "negans" would check it out, then call and report it if it violated policy. Miller made this statement as if it were some kind of a joke. When Lang indicated she wanted to file a complaint for discrimination, Miller told Lang "You are making a huge mistake." Miller stated, "I strongly suggest you talk to the Warden," or words to that effect. Miller claimed she was "sure" TDCJ would give Lang the next Captain's position that came open. Lang believed, however, that she should not have to wait for the next position when she was more qualified than the Caucasian woman promoted over her, and Lang filed a written complaint of discrimination days later.

15.     Before Lang applied for the Captain's position, on numerous occasions Miller had discussed other employees' discrimination (or "EEO") complaints with Lang. Some were complaints that related in some way to Lang (although none were ever sustained against Lang),

and Miller had confided to Lang both the existence of those complaints and their outcomes. Miller had also confided information to Lang about complaints that did not involve her. Upon information and belief, Miller did not keep discrimination complaints confidential, and it was generally known at TDCJ that both Lang and the other black / African American applicant for Captain (Young) had complained of racial discrimination relating to Colbert's selection as Captain. Also on information and belief, Warden Wright was presented with Lang's complaint, because TDCJ's investigation policy required Wright to give a statement regarding Colbert's selection. Further, it was common practice in 2017 for the Hobby/Marlin administration to keep the senior warden (Wright) informed about what was happening in the unit, so she (Wright) would not be caught off guard.

16.     Prior to June 27, 2017, TDCJ's practice with regard to staff meetings had been that the Lieutenant scheduled to be on duty during the staff meeting would fulfill her duties and miss the staff meeting. All other staff would attend the meeting and later tell the Lieutenant who had missed the meeting what had occurred. In the two years Lang had been assigned to the Marlin Unit, Lang had never once been relieved of her duties in order to attend a staff meeting. However, on July 5, 2017 – a mere eight (8) days after Lang made her discrimination complaint to Miller on June 27, 2017 – Lang was relieved of her job duties at the Marlin Unit and instructed to report to a staff meeting. At Warden Wright's instruction, newly promoted Captain Kristi Colbert was sent to inform Lang of this, and Colbert missed the staff meeting to fulfill Lang's duties at the Marlin Unit so Lang would be present at the staff meeting and Colbert would not.

17.     At the July 5, 2017, staff meeting, Warden Wright waited for Lang to arrive before beginning the meeting. When Lang arrived, Wright complained about negative "morale" that had allegedly resulted from Wright's selection of Colbert for Captain. Wright indicated that morale "starts with the lieutenants." However, only seven (7) lieutenants were at the meeting, while four

(4) were absent. Warden Wright indicated that she "had never been so embarrassed in her life" because of the way Wright alleged Captain Colbert had been treated since her promotion. Wright claimed lieutenants had made negative comments on social media, that a lieutenant had indicated she was no longer speaking to another staff member because that staff member had congratulated Colbert. Significantly, Lang had been out on sick leave and had not engaged in any of the behavior Warden Wright described – all Lang had done was complain of discrimination through appropriate TDCJ channels.

18.     Warden Wright then informed the lieutenants present that "no one should be mad at Captain Colbert because all Colbert did was turn in her application," and that anyone unhappy with Colbert's promotion should be mad at Warden Wright because "she made the selection." However, Wright also stated she "has the right to promote whoever she wants." Wright went on to state that if those present did not want to be her lieutenants anymore, they could fill out one of the forms Wright held in her hand and placed on the counter. Wright then stated she would "probably never get over this" and walked out of the room. Another Warden – Warden Markum – took over the meeting, saying Warden Wright was "very emotional," and repeating that the lieutenants "set the morale for the whole unit." Warden Markum then left the room.

19.     At this point, Major Palmer took over the meeting and began to address a written handout those present had received. On the handout was a list of job duties Palmer indicated allegedly needed to be completed every day. In the four years Lang had been a lieutenant, she had never seen this piece of paper before. When lieutenants began to express concern, the superior officers present asked, "do you not want to be a lieutenant? Then fill out the paper…" Some of the superior officers began to scream and yell, and at one point it appeared a physical confrontation might occur. Lang left the meeting, went straight to Warden Wright's door and knocked. Lang informed

Warden Wright the staff meeting had spun out of control and that Lang was upset. Lang asked if she could go home. Warden sarcastically responded, "Sure—you can't take it." Significantly, the only behavior Lang had engaged in prior to Warden's directing such contempt at her was applying for the Captain position herself and then filing a complaint of discrimination about Colbert's selection.

20.     Almost immediately, Lang's work life changed. She was subjected to a hostile work environment, including but not limited to the following respects:

- Lang was forced to work without appropriate staffing ratios on several occasions;

- Lang was moved from the N1 Unit on first shift to Hobby night shift;

- When it was pointed out this was retaliation for Lang's EEO discrimination complaint, Lang was moved back to N1 but kept on the night shift;

- When Lang complained to the Regional Director, Melody Nelson (on two separate occasions), Nelson stated maybe Lang should transfer to a different unit;

- In her new shift, in addition to the normal job duties every lieutenant was required to do, Lang was given a new set of individual job duties and responsibilities just for her – duties other lieutenants on the same shift as Lang were not required to do, including but not limited to:

  o making rounds
  o conducting four suicide drills per month
  o reviewing overtime submissions of other officers called in during the work cycle against a snapshot report
  o changing such time from overtime to non-overtime
  o reviewing Ad. Seg. paperwork daily and signing I-216's and I-201's
  o ensuring documentation of deficiencies on an AD-84
  o handling 4 minor cases
  o searching two offenders' cells daily and writing a report of what was found
  o monitoring another employee's painting job and ensuring that employee provided a copy of how much paint TDCJ had, and a copy of the paint schedule.

Lang was a team player and did not mind taking on extra responsibility. However, piling these additional responsibilities on Lang when she already had as much work to do as the others was retaliation for having complained about discrimination. Further, prior to complaining of discrimination, Lang had always experienced a good working relationship with her superiors and saw TDCJ as a welcoming place where administrators were concerned about her wellbeing. After complaining of discrimination (and after filing several new complaints alleging retaliation), Lang's superiors began to mock her medical condition (which was supposed to have been confidential), as well as her religion.

21.     On numerous occasions between June 27, 2017, and September 4, 2018, Lang reported and complained to the EEO office and various representatives of TDCJ that she had been the victim of race discrimination (in having been passed over for Captain in June of 2017), and that she was being subjected to retaliation for having previously complained of racial discrimination. Specifically, Lang filed complaints with Major Cordelia Miller (06/27/2017), Caroline Herring (07/06/2017, 01/03/2018, and 07/20/2018) and Major Patricia Williams (07/20/2018) alleging this previous discrimination and ongoing retaliation and hostile work environment by Warden Wright, Captain Bailey, and Major Miller, among others. During one of Lang's discussions with Major Williams regarding these complaints of retaliation, Williams informed Lang that if Lang claimed retaliation, Williams "wouldn't be able to help her." In a discussion with Warden Wright regarding Lang's treatment by Wright and others, Warden Wright informed Lang that all of the administrators "are one."

**C)   Retaliatory and Pretextual Disciplinary Actions / Termination:**

22.     Major Miller retaliated against Lang through disciplinary action on at least one occasion, falsely writing up a disciplinary action against Lang on December 14, 2017, for supposedly having

been insubordinate to Miller the day before during the discussion of a fairly routine scheduling matter. Lang, however, was not insubordinate. On that occasion, Lang had been made aware she might not be able to take her scheduled day off (December 13, 2017), and that if Lieutenant Hildreth did not return from leave, TDCJ would require Lang to Hildreth's shift at the Hobby Unit. Lang and Hildreth spoke by telephone, and Hildreth informed Lang she had a doctor's release and would be back at work on December 13 and Lang would not need to fill in for her. Accordingly, Lang did not appear for Hildreth's shift. Miller then called Lang and complained that Lang had "not shown up," and Lang explained what had had happened. Although Lang was not insubordinate or disrespectful during the call, Miller nevertheless wrote Lang up for "insubordination" and "misconduct." When the matter came to hearing in May of 2018, based on Miller's testimony, Warden Wright placed Lang on three months' probation.

23.     In July of 2018, Lang took a short leave under the Family and Medical Leave Act (FMLA) to treat a depression issue exacerbated by the hostile work environment she had experienced over the previous year. With the accommodation of this short leave and treatment, Lang was still fully able to perform the essential functions of her job. While Lang was on leave, she was contacted by a co-worker indicating the co-worker had been asked to write some sort of a statement about Lang. Lang was not able to ascertain the nature of the situation, she had not been at work in several days because of her leave, and Lang hung up the phone unclear about what had transpired. Ms. Lang then contacted a second co-worker to see if the second co-worker had any information about what was going on. The second co-worker indicated that one of their supervisors (Captain Bailey – one of the superiors against whom Lang had made an EEO complaint) had approached the second co-worker and asked her to write a negative statement about Lang.

24.     Lang contacted her own supervisor about returning to work and was instructed to report

without her uniform. When she did, Lang was then notified for the first time that TDCJ was investigating an alleged prior incident in which TDCJ contended Lang had uttered a curse word or used vulgar language while on duty. Lang denied the allegation because it was untrue, but TDCJ not only proceeded to charge Lang with the alleged use of the curse word or vulgar language, it also now charged Lang with having allegedly attempted to "tamper" with a witness (even though TDCJ had never previously notified Lang any investigation was in progress). Ultimately, TDCJ terminated Lang on or about September 4, 2018, by giving her the "option" to resign or be fired. Lang would show the insubordination/misconduct and cursing and witness tampering allegations against her were false and pretextual, and that the real reason for her termination was retaliation against for having complained about race and color discrimination, and in retaliation for having complained about the retaliatory hostile work environment.

## V.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

25.      Lang timely submitted a questionnaire/complaint to the Texas Workforce Commission Civil Rights Division on or about March 1, 2019, within one hundred eighty (180) days and three hundred (300) days of her termination, and within one hundred eighty (180) and three hundred (300) days after the period of continuous retaliatory action of subjecting her to a hostile work environment finally ended in her termination. In her questionnaire/complaint, Lang indicated she was the victim of retaliation for having complained of discrimination, and she indicated her desire to file a Charge of Discrimination, and that her Charge be dual-filed with both the Texas Workforce Commission's Civil Rights Division (TWC CRD) and the Equal Employment Opportunity Commission (EEOC).

26.      Under the TWC/CRD's work-share agreement with the EEOC, TWC/CRD prepared a Charge of Discrimination for Lang to sign, and Lang executed it promptly on May 7, 2019. The

Charge relates back to Lang's initial March 1, 2019, inquiry, which she was entitled at all times to amend and perfect. Lang's Charge was investigated by TWC/CRD under the workshare agreement between TWC/CRD and the EEOC.

27.    When the Texas Department of Criminal Justice failed to resolve this matter at the administrative level, the United States Department of Justice's Civil Rights Division issued Lang a right to sue letter on July 8, 2020, which was received on the same date by Lang and her attorney. Lang timely filed this Complaint within ninety (90) days of receiving her EEOC right to sue letter.

## VI.    CAUSES OF ACTION

### A) COUNT 1: Title VII Retaliation: Hostile Work Environment.

28.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-27.

29.    Defendant TDCJ is an "employer" as defined under Title VII.

30.    Lang's internal EEO complaints alleging discrimination on the basis of race and color, as well as her actions in pursuit of it, were all protected activity under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII").

31.    Further, each and every subsequent grievance Lang filed with TDCJ – claiming that the disciplinary actions, changes in the terms and conditions of her employment, being assigned additional duties not assigned to other lieutenants on her shift who had not complained of discrimination, mocking her religion and medical condition, being assigned to less desirable units and shifts – were all part of a hostile work environment in retaliation for having filed her previous oral and written EEO complaints – were each separate protected activities under Title VII.

32.    Title VII expressly prohibits discrimination based on race and color, and it makes such discrimination an unlawful employment practice. Lang's internal EEO compliant, her actions in

pursuit of it, and her grievances described in the preceding paragraph all opposed such discriminatory practices prohibited by Title VII.

33.     Title VII expressly prohibits an employer from retaliating against an employee because she has opposed any practice made an unlawful practice by Title VII, because she has filed a charge, or because she has testified, assisted or participated in any manner in an investigation, proceeding, or hearing under Title VII.   42 U.S.C. §2000e-3.

34.     From June 27, 2017, until Lang's termination on or about September 4, 2018, TDCJ retaliated against Lang by subjecting her to a hostile work environment, as described more fully above. This environment, which continued from June 27, 2017, through Lang's termination September 4, 2018, is a continuous pattern of action that, when taken together, would tend to dissuade a reasonable worker from complaining of discrimination or retaliation.

35.     The reasons given for such actions taken against Lang were pretexts for retaliation and were not the true reason. The true reason was retaliation for Lang's having complained about discrimination and previous retaliation.

36.     Plaintiff need not prove that every TDCJ agent, employee or representative participating in the creation of her hostile work environment had a retaliatory motive. Rather, in the alternative, Plaintiff would show that one or more of those TDCJ actors did act out of an unlawful retaliatory motive. Regardless of whether any or all of the other actors involved shared this retaliatory motive, Lang would show that any TDCJ agent's, employee's, or representative's retaliatory motive is imputed to TDCJ's other actors because: 1) such TDCJ agents, employees, or representatives committed acts of a retaliatory nature against Lang; 2) such TDCJ agents, employees, or representatives intended those acts would cause Lang to suffer a hostile work environment or other adverse employment action; and 3) such TDCJ agents, employees, or representatives actions

caused the hostile work environment or other adverse employment action, regardless of whether such TDCJ agents, employees, or representatives with a retaliatory motive participated in the hostile work environment.

37.     Lang hereby sues for retaliation in the form of a hostile work environment under Title VII.

   **B) <u>COUNT 2: Title VII Retaliation: Termination</u>**

38.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-37.

39.     Defendant TDCJ is an "employer" as defined under Title VII.

40.     Lang's internal EEO complaints alleging discrimination on the basis of race and color, as well as her actions in pursuit of it, were all protected activity under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII").

41.     Further, each and every subsequent grievance Lang filed with TDCJ – claiming that the disciplinary actions, changes in the terms and conditions of her employment, being assigned additional duties not assigned to other lieutenants on her shift who had not complained of discrimination, mocking her religion and medical condition, being assigned to less desirable units and shifts – were all part of a hostile work environment in retaliation for having filed her previous oral and written EEO complaints – were each separate protected activities under Title VII.

42.     Title VII expressly prohibits discrimination based on race and color, and it makes such discrimination an unlawful employment practice. Lang's internal EEO compliant, her actions in pursuit of it, and her grievances described in the preceding paragraph all opposed such discriminatory practices prohibited by Title VII.

43.     Title VII expressly prohibits an employer from retaliating against an employee because she has opposed any practice made an unlawful practice by Title VII, because she has filed a charge,

or because she has testified, assisted or participated in any manner in an investigation, proceeding, or hearing under Title VII.   42 U.S.C. §2000e-3.

44.     TDCJ retaliated against Lang by terminating her employment on or about September 4, 2018.

45.     The reasons given for Lang's termination were pretexts for retaliation and were not the true reason. The true reason was retaliation for complaining about discrimination and previous retaliation.

46.     Plaintiff need not prove that every TDCJ agent, employee or representative participating in Lang's termination had a retaliatory motive, or that any ultimate decision maker(s) in Lang's termination had a retaliatory motive. Rather, in the alternative, Plaintiff would show that one or more of those TDCJ actors did act out of an unlawful retaliatory motive. Regardless of whether any or all of the other actors involved share this retaliatory motive, Lang would show that any TDCJ agent's, employee's, or representative's retaliatory motive is imputed to TDCJ's other actors because: 1) such TDCJ agents, employees, or representatives committed acts of a retaliatory nature against Lang; 2) such TDCJ agents, employees, or representatives intended those acts would cause Lang to suffer termination or other adverse employment action; and 3) such TDCJ agents, employees, or representatives actions caused the termination or other adverse employment action, regardless of whether such TDCJ agents, employees, or representatives with a retaliatory motive participated in the hostile work environment.

47.     Lang hereby sues for retaliation in the form of termination under Title VII.

## VII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Sonja Lang respectfully requests the following relief:

   a.   Grant Lang injunctive relief ordering Defendant to make Lang whole by reinstating her to her former position, with all seniority, salary, benefits,

retirement eligibility and any other employee statuses completely restored;

b. Grant Lang injunctive relief or monetary damages ordering Defendant to make Lang whole by providing compensation for past and future pecuniary and economic losses resulting from Defendant's unlawful practices described above, including but not limited to back pay, front pay, health and other fringe benefits and pecuniary harm resulting from the loss of such benefits, as well as the pecuniary harm to Lang's retirement contributions, vesting, draw schedule, or any other pecuniary loss;

c. Grant Lang injunctive relief or monetary damages ordering Defendant to make Lang whole by providing compensation for non-pecuniary losses resulting from the unlawful practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of self-esteem, loss of civil rights and nominal damages, in an amount to be determined at trial;

d. Grant Lang injunctive relief or monetary damages ordering Defendant to pay Lang's litigation costs and expenses, including reasonable attorneys' fees, expert witness fees, and pre-judgment and post-judgment interest; and

e. Grant such further relief as the Court deems necessary and proper.

### <u>DEMAND FOR JURY</u>

Plaintiff demands trial by jury of all issues of fact raised by this Complaint.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
**HART LAW FIRM, PLLC**
*Wtaylor@thehartlawfirm.com*
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax: (682) 292-7406
**ATTORNEY FOR SONJA LANG**

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify by my signature above that a true and correct copy of the foregoing document has this day been served via certified mail, return receipt requested, electronic service, facsimile or hand delivery in open court, upon the following on this 27th day of August, 2020:

Briana M. Webb
*Briana.Webb@oag.texas.gov*
OFFICE OF THE ATTORNEY GENERAL
**ATTORNEYS FOR DEFENDANT**